## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

SIGNODE INDUSTRIAL GROUP LLC,

        Plaintiff,

                              Case No.:

v.

JONATHAN GIPPERICH,

        Defendant.

_____/

## COMPLAINT, INCLUDING REQUEST FOR INJUNCTIVE RELIEF

Plaintiff, Signode Industrial Group LLC ("Signode" or "the Company"), by and through its undersigned counsel, brings this action against Defendant, Jonathan Gipperich ("Gipperich" or "Defendant"), and states:

### INTRODUCTION

1. Gipperich was a long-time Signode employee and signatory to the Signode Confidentiality and Non-Solicitation Agreement ("the Agreement").

2. In this action, Signode seeks injunctive and monetary relief stemming from Gipperich's theft of Signode confidential information and trade secrets in violation of the Agreement and state and federal statutes designed specifically to protect such data.

3. As set forth below, Gipperich breached his contractual and statutory obligations when he resigned from the Company, took thousands of electronic files containing Signode confidential and proprietary information, and immediately shared at least some of those files with his "new" employer, one of Signode's largest competitors.

4. Once Signode realized the theft, it immediately put Gipperich and his employer on notice of the breach.

5. Gipperich has since admitted the theft but did not return the external drives onto which he downloaded Signode's information.

6. And while Signode is advised that Gipperich's employment with his "new" employer is terminated, Gipperich still has not returned and continues to retain an enormous volume of Signode confidential information, nor has he accounted for how that information has been disseminated since he departed from Signode.

7. Signode has no adequate remedy at law to remedy the breach which is why it has filed a motion seeking temporary, emergency relief contemporaneously with the filing of this complaint.

**PARTIES, JURISDICTION, AND VENUE**

8. Signode is a Delaware limited liability company that is authorized to do business in Florida and maintains its headquarters and principal place of business in Hillsborough County, Florida, at 14025 Riveredge Drive, Suite 500, Tampa, Florida 33637.

9. Signode is wholly owned by Crown Holdings, Inc., a Pennsylvania corporation, that is also authorized to do business in Florida and maintains its headquarters and principal place of business in Hillsborough County, Florida, at 14025 Riveredge Drive, Suite 300, Tampa, Florida 33637.

10. Defendant is an individual who resides in Cook County, Illinois.

11. This Court has personal jurisdiction over Gipperich pursuant to Florida's long-arm statute, Section 48.193(1)(a)2., Florida Statutes, where the causes of action herein arise out of Gipperich's commission of tortious acts within this state including those that were intended to and in fact harmed Signode in this state; and Section 48.193(7), Florida Statutes because

Gipperich breached the Agreement between the parties by failing to perform acts required by the Agreement in Florida

12.     Further, Gipperich routinely visited Tampa for business meetings and activities related to his jobs with Signode, and he expressly agreed to this Court's jurisdiction in Paragraph 13 of the Agreement, which provides:

> **Governing Law**. The Parties agree that this Agreement shall be governed by and construed in accordance with the laws of the State of Florida without giving effect to any conflicts of law provisions. The Parties also agree that any action or suit brought by any party to enforce or adjudicate the rights of the Parties to and under this Agreement shall be brought in the District Court for the Middle District of Florida, assuming federal statutory jurisdictional requirements are met, or alternatively in the Circuit Court for Hillsborough County, Florida, but only in the event federal statutory jurisdictional requirements cannot be met, these two Courts being the sole, exclusive, and mandatory venue(s) and jurisdiction(s) for any disputes between the Parties arising from or relating to this Agreement. By entering into this Agreement, [Gipperich] consents to the jurisdiction of the District Court for the Middle District of Florida and the Circuit Court for Hillsborough County, Florida. If any action is filed, by any party, relating to a breach of this Agreement and/or enforcement of this Agreement, [Gipperich] expressly agrees and consents to jurisdiction in the District Court for the Middle District of Florida and/or the Circuit Court for Hillsborough County, Florida and waives any claim that the District Court for the Middle District of Florida and/or the Circuit Court for Hillsborough County, Florida lacks personal jurisdiction or is an inconvenient forum.

Accordingly, Gipperich has sufficient minimum contacts with Florida so that he could reasonably expect to be called into court within this State.

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Signode has asserted a claim for misappropriation of trade secrets against Gipperich under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, as amended. This Court has supplemental or pendant jurisdiction over Signode's remaining claims pursuant to 28 U.S.C. § 1367.

14. In addition, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different States. In addition, pursuant to Paragraph 13 of the Agreement, both parties have consented to the jurisdiction of this Court for any action to enforce the terms of the Agreement.

15. Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b)(2), because the Signode property, confidential information, proprietary information, and trade secrets improperly taken by Gipperich were located in Signode's computer storage systems located in Hillsborough County, Florida. In addition, pursuant to Paragraph 13 of the Agreement, both parties have consented to venue in this Court.

## FACTS

### BASIC EMPLOYMENT HISTORY

16. Signode and its global affiliates form one of the world's premier industrial-packaging providers with a rich history dating back over a century. Signode makes and sells hundreds of products that protect its customers' goods during warehousing and transit. Those products include consumables—such as plastic strap, steel strap, and plastic stretch film—and tools and equipment that apply the consumables to goods to pack, bundle, unitize, protect, and secure them.

17. Gipperich began his employment with Signode as a Packaging Research Engineer around 2003. Thereafter he was promoted several times, including roles as a Marketing Specialist, Sales Manager, and Product Manager.

18. In June 2024, Gipperich was promoted to Interim Director, Product Management, and then, in January 2025, to Director, Product Management. During this time, he (and his team)

were responsible for product management for the Americas region for plastic strapping, steel strapping, film, and protective products (including edge protection, dunnage airbags, tier sheets, and the like).

19.     Following a restructuring of the Product Management function in July 2025, Gipperich's team was reassigned, and Gipperich himself assumed responsibility for Signode's plastic strapping, steel strapping, and plastic strapping equipment product lines for the Americas region. Responsibility for the film and protective products product lines was reassigned to other Signode employees. Gipperich's title, pay, and annual incentive plan remained the same.

20.     On October 2, 2025, Gipperich submitted his voluntary resignation from Signode and ended his employment later that day.

## THE AGREEMENT

21.     On or about September 16, 2022, Gipperich and Signode entered into the Agreement, a true and correct copy of which is attached as **Exhibit A**.

22.     Paragraph 4 of the Agreement contains Non-Disclosure of Confidential Information obligations by which Gipperich agreed, in relevant part:

> The Parties acknowledge and agree that [Gipperich's] work requires access to Signode's Confidential Information, and that Signode's Confidential Information is valuable information belonging to Signode. Maintaining the confidentiality of such information is crucial to Signode's present and future success. The Parties acknowledge and agree that protection of Signode's Confidential Information constitutes a legitimate protectable interest of Signode. The Parties acknowledge and agree that Signode would not be willing to provide [Gipperich] access to Signode's Confidential Information without the assurance of reasonable protection against any use of this information by [Gipperich] in a manner inconsistent with Signode's best interests.

23.     Paragraph No. 1(c) of the Agreement defines "Confidential Information" as follows:

"Confidential Information" is any information not generally known by or readily available to the public at the time of disclosure or use, concerning any aspect of the business or affairs of the disclosing party, and that is intended to be protected from disclosure, including (but not limited to): (1) business plans and strategies; (2) copywritable works (including compositions); (3) customer information (including customer and prospective customer lists, individual customer contact information and preferences, CRM databases, special discounts, customer usages, and customer requirements); (4) engineering and product information (including product information designs, specifications, capabilities, drawings, diagrams, blueprints, models, and similar items; testing data; product-improvement plans; information about future products and the research and development pipeline; product formulas; engineering drawings; records of invention; unpublished patent applications; technical reports; and competitive analyses); (5) financial data (including capital investment plans, earnings projections, sales figures, pricing, and margins); (6) information received from a third party under confidentiality obligations; (7) inventions (whether patentable or not); (8) know-how; (9) marketing data, plans, and programs; (10) personnel-related information and employee personal data (defined as any individually identifiable information about a natural person or from which a natural person reasonably could be identified) obtained from confidential personnel files or by virtue of Employee's performance of assigned job responsibilities; (11) processes and methods (including manufacturing processes); (12) research and development programs; (13) sales methods; (14) software (including computer programs and software code); (15) supplier and vendor information (including customer and vendor and prospective customer and vendor lists, individual supplier and vendor contact information, special discounts, preferred suppliers and vendors, and cost/source of raw materials); (16) technology; and (17) trade secrets in any form (whether oral, electronic, written, graphic, or other printed form or obtained from access to or observation of facilities or operations)..

24. Under Paragraph 4(a) of the Agreement, Gipperich agreed that he had "a duty to protect Signode's Confidential Information. . ."

25. Under Paragraph No. 4(b) of the Agreement, Gipperich agreed that:

In addition, and without limiting the duties imposed on [Gipperich] by law, [Gipperich] agrees that during [Gipperich's] employment with Signode and for a period of two (2) years following the

voluntary or involuntary termination of [Gipperich's] employment for any reason, [Gipperich] will not disclose to any third party or use, directly or indirectly, any Signode Confidential Information, except as required by law or with Signode's express prior written consent..

26. Under Paragraph No. 4(c) of the Agreement, Gipperich agreed that:

… certain of Signode's Confidential Information is a "trade secret" as that term is defined in the federal Defend Trade Secrets Act of 2016 (18 U.S.C. §§ 1839(3) & 1890(b)(1)) and/or the Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001, et seq. [Gipperich] agrees that [Gipperich] shall never disclose to a third party or use any trade secrets of Signode, whether during [Gipperich's] employment with Signode or at any time following the voluntary or involuntary termination of [Gipperich's] employment with Signode, unless made in accordance with an express exception set forth in applicable federal, state, or local law(s). The Parties agree that nothing in this Agreement shall be construed to limit or negate the common law of torts or trade secrets where it provides Signode with broader protection than that provided herein.

27. Under Paragraph No. 4(g) of the Agreement, Gipperich agreed "that any breach by [Gipperich] of any aspect of this Paragraph will entitle Signode to any and all relief provided for under Paragraph 10 of this Agreement."

28. Paragraph No. 10 of the Agreement states as follows:

Employee understands and acknowledges that irreparable injury will result to Signode and its business in the event of a breach of any of the covenants or obligations contained in this Agreement. Employee also acknowledges and agrees that the damages or injuries which Signode may sustain as a result of such a breach are difficult to ascertain and money damages alone would not be an adequate remedy to Signode. Employee therefore agrees that if a controversy arises concerning the rights or obligations contained in this Agreement or Employee breaches any of the covenants or obligations contained in this Agreement, Signode shall be entitled to any injunctive or other relief necessary to enforce, prevent, or restrain any violation of the provisions of this Agreement (without posting a bond or other security). Such relief shall be cumulative and non-exclusive and shall be in addition to any other right or remedy to which Signode may be entitled. Employee also agrees that any breach by Employee of Employee's obligations

enumerated in this Agreement shall entitle Signode to reimbursement of any and all attorneys' fees and costs incurred by Signode in enforcing this Agreement or taking action against Employee for breach of this Agreement.

### SIGNODE'S OBLIGATIONS UNDER THE AGREEMENT

29. During the course of Gipperich's employment, Signode granted Gipperich access to Signode's confidential information, proprietary information, and trade secrets, which was necessary in connection with Gipperich's position and job responsibilities.

30. During the course of Gipperich's employment, Signode compensated Gipperich, including Gipperich's participation in Signode's annual incentive plan.

### GIPPERICH'S IMPROPER CONDUCT AND CONTRACTUAL BREACHES

31. Despite Signode's fulfillment of its obligations under the Agreement, Gipperich took affirmative steps during and after his separation from employment with Signode, in violation of Paragraph 4 of the Agreement, and statutory and common law, to misappropriate Signode's confidential and/or proprietary information and trade secrets, and to materially harm Signode in the process.

32. The material Gipperich misappropriated includes information and documents that can generally be categorized as internal and confidential and/or proprietary Signode documents regarding Signode's processes, policies, business strategies, business structure and design, products, financials, business operations, operating manuals, forms, slides, and/or templates, and includes more specifically but without limitation: detailed information regarding new products and products in development; raw material pricing; conversion reports; detailed sales data; internal sales strategy; executive summaries; detailed pricing reports; business strategy reports; market research reports; monthly sales data; customer and client lists; and other non-public business information.

33. While the investigation is ongoing, to date, with respect to the theft, Signode has discovered the following:

    a. On or about August 11, 2025, Gipperich transferred approximately 16 files from Signode's internal storage system to a personal portable storage device.

    b. On or about September 2, 2025, Gipperich transferred approximately 1,758 files from Signode's internal storage system to a personal portable storage device.

    c. On or about September 3, 2025, Gipperich transferred approximately 3 files from Signode's internal storage system to a personal portable storage device.

    d. On or about September 8, 2025, Gipperich transferred approximately 56 files from Signode's internal storage system to a personal portable storage device.

    e. On or about September 9, 2025, Gipperich transferred approximately 2 files from Signode's internal storage system to a personal portable storage device.

    f. On or about September 10, 2025, Gipperich transferred approximately 68 files from Signode's internal storage system to a personal portable storage device.

    g. On or about September 17, 2025, Gipperich transferred approximately 3 files from Signode's internal storage system to a personal portable storage device.

    h. On or about September 22, 2025, Gipperich transferred approximately 1 file from Signode's internal storage system to a personal portable storage device.

    i. On or about September 30, 2025, Gipperich transferred approximately 414 files from Signode's internal storage system to a personal portable storage device

    j. On or about October 1, 2025, the day before Gipperich abruptly submitted his resignation to Signode, Gipperich transferred approximately 3,355 files from Signode's internal storage system to a personal portable storage device.

  k. On or about October 2, 2025, the day Gipperich resigned, Gipperich transferred approximately 960 files from Signode's internal storage system to a personal portable storage device.

34. These *6,636 files* are Signode property and contain critical Signode confidential and/or proprietary information, and/or Signode trade secrets.

35. Signode's computer use policy prohibits Signode employees like Gipperich from transferring Signode files to external devices without express permission. Signode never provided permission to Gipperich. A copy of the policy is attached as **Exhibit B**.

36. The "personal portable storage device" referenced above was identified as "My Passport 0820", serial number: WX21AB41LE2T. Upon information and belief, this device belongs to Gipperich. This device was never issued to Gipperich by Signode, and Signode never granted Gipperich permission to place any Signode files on this device.

37. At no point before he was caught did Gipperich disclose the existence and/or use of a "personal portable storage device" to anyone at Signode.

38. Upon information and belief, the "personal portable storage device" referenced in remains in Gipperich's possession.

39. Upon information and belief, the "personal portable storage device" still contains Signode's files.

40. Signode has learned that, after Gipperich's resignation, he immediately became employed by a key Signode competitor and shared at least some of the stolen information with the competitor and its employees. When Signode made demand upon the competitor, it conducted an internal investigation, and Gipperich's "new" employment terminated.

41. Signode has also made a demand to Gipperich for the return of Signode's information. *See* **Composite Exhibit C.**

42. To date, Gipperich himself has not responded.

43. However, on Saturday, October 18, an email exchange occurred between Signode's outside labor counsel, Joel S. Aziere, Esq. and Gipperich's counsel Gina DiBella, Esq. On information and belief, Attorney DiBella is also Defendant's wife. Signode again demanded the return of its information. But, the data and storage devices have not been returned.

## COUNT I

### BREACH OF CONTRACT (INJUNCTIVE RELIEF)

44. Signode realleges and incorporates by reference the allegations set forth in Paragraph Nos. 1 through 43, *supra*.

45. Signode and Gipperich entered into the Agreement.

46. Signode has a legitimate business interest in protecting its property, confidential information, proprietary information, and trade secrets. The Agreement is narrowly tailored and reasonably necessary to protect Signode's legitimate business interest as articulated herein.

47. The Agreement is a valid and enforceable contract between Signode and Gipperich, and is supported by ample consideration, as fully set forth both herein as well as in Exhibit A.

48. Signode fully performed its obligations under the Agreement and performed all conditions precedent on its part under the terms of the Agreement.

49. Gipperich failed to fulfill his obligations under the Agreement, in that he has (i) taken, used, and disclosed to a third-party Signode's confidential information, proprietary

information, and trade secrets; and (ii) failed to return all Signode property to Signode immediately upon his voluntary resignation from Signode and even after demand.

50. Gipperich's violations of the Agreement are ongoing.

51. Gipperich's misconduct is in direct violation of the Agreement.

52. The Agreement is not over-broad or over-long.

53. As set forth above, the Agreement is governed by Florida law.

54. Defendants' violations of the Agreement create a legal presumption of irreparable harm pursuant to Section 542.335, Florida Statutes.

55. Plaintiff has no adequate legal remedy to prevent future violations of the Agreement.

56. Plaintiff has a substantial likelihood of succeeding on the merits of its claim.

57. The considerations of the public interest support the entry of an injunction in this case.

## COUNT II

### BREACH OF CONTRACT (DAMAGES)

58. Signode realleges and incorporates by reference the allegations set forth in Paragraph Nos. 1 through 43, *supra*.

59. The parties entered into the Agreement

60. Defendant has breached the Agreement by engaging in competitive activities prohibited under the contract.

61. As a result of the breach, Plaintiff has been damaged and is entitled to recover such damages up and until the time an injunction is issued, and for any subsequent breaches.

## COUNT III

### VIOLATIONS OF THE DEFEND TRADE SECRETS ACT OF 2016

62. Signode realleges and incorporates by reference the allegations set forth in Paragraph Nos. 1 through 43, *supra*.

63. Before leaving Signode, Gipperich accessed and took confidential and proprietary information from Signode, including but not limited to the following: detailed information regarding new products and products in development; raw material pricing; conversion reports; detailed sales data; internal sales strategy; executive summaries; detailed pricing reports; business strategy reports; market research reports; monthly sales data; customer and client lists; and other non-public business information.

64. Signode took reasonable steps to keep the aforementioned confidential and proprietary information confidential and secret, including making employees sign agreements acknowledging that all such information is to remain confidential.

65. Signode's confidential and proprietary information is not generally known to the public and is not readily ascertainable through proper means.

66. Signode's confidential and proprietary information derives independent economic value precisely because it is not generally known, Signode has undergone significant expense, time, and effort in acquiring this information, and it is confidential to Signode.

67. Signode's confidential and proprietary information, including the information accessed and taken by Gipperich, constitute trade secrets under 18 U.S.C. § 1839(3).

68. These trade secrets relate to products and services used in, or intended for use in, international commerce as Signode's products and services are marketed, sold, and distributed to customers and suppliers throughout the United States and the world.

69. Gipperich misappropriated Signode's trade secrets.

70. Gipperich was and is required to return all trade secrets to which he had access during his employment upon the termination of his employment relationship as stated in the Agreement. By accessing and taking the trade secrets for personal use, Gipperich acquired the trade secrets without Signode's consent and by improper means.

71. Gipperich is still in possession of the files referenced in Paragraph 36, *supra*, which Gipperich has attempted to use to compete with Signode.

72. As a direct and proximate result of Gipperich's misappropriation of Signode's trade secrets, Signode has suffered and continues to suffer irreparable harm, including loss of the value of its trade secrets, and the potential competitive advantage conferred on others through the unauthorized use or disclosure of Signode's trade secrets.

73. Signode has suffered monetary damages as a result of Gipperich's conduct, in violation of the Defend Trade Secrets Act of 2016, and will continue to suffer such damages so long as Gipperich's conduct is allowed to continue.

74. Gipperich's conduct is willful and malicious, thereby entitling Signode to exemplary damages and an award of attorneys' fees and costs pursuant to 18 U.S.C. § 1836(b)(3)(C)–(D).

## COUNT IV

### VIOLATIONS OF THE FLORIDA UNIFORM TRADE SECRETS ACT

75. Signode realleges and incorporates by reference the allegations set forth in Paragraph Nos. 1 through 43, supra.

76. Before leaving Signode, Gipperich accessed and took confidential and proprietary information from Signode, including but not limited to the following: detailed information regarding new products and products in development; raw material pricing; conversion reports;

detailed sales data; internal sales strategy; executive summaries; detailed pricing reports; business strategy reports; market research reports; monthly sales data; customer and client lists; and other non-public business information.

77. Signode took reasonable steps to keep the aforementioned confidential and proprietary information confidential and secret, including making employees sign agreements acknowledging that all such information is to remain confidential.

78. Signode's confidential and proprietary information is not generally known to the public and is not readily ascertainable through proper means.

79. Signode's confidential and proprietary information derives independent economic value precisely because it is not generally known, Signode has undergone significant expense, time, and effort in acquiring this information, and it is confidential to Signode.

80. Signode's confidential and proprietary information, including the information accessed and taken by Gipperich, constitute trade secrets under Fla. Stat. § 688.002(4).

81. Gipperich, without authorization, misappropriated Signode's trade secrets as defined in Fla. Stat. § 688.002(2) by acquiring, retaining, and using those trade secrets through improper means and for his own benefit or for the benefit of a competitor, including by copying and removing thousands of files containing Signode's trade secrets from Signode's systems and retaining them after termination of employment and after demand.

82. Gipperich was and is required to return all trade secrets to which he had access to during his employment upon the termination of his employment relationship as stated in the Agreement. By accessing and taking the trade secrets for personal use, Gipperich acquired the trade secrets without Signode's consent and by improper means.

83. Gipperich is still in possession of the files referenced in Paragraph 36, *supra*, which Gipperich has attempted to use to compete with Signode.

84. As a direct and proximate result of Gipperich's misappropriation of Signode's trade secrets, Signode has suffered and continues to suffer irreparable harm and substantial damages, including loss of the value of its trade secrets and the potential competitive advantage conferred on others through the unauthorized use or disclosure of Signode's trade secrets.

85. Signode has suffered monetary damages as a result of Gipperich's actions and will continue to suffer such damages so long as Gipperich's conduct is allowed to continue.

86. Gipperich's conduct was willful and malicious, entitling Signode to an award of exemplary damages pursuant to Fla. Stat. § 688.004(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Signode Industrial Group LLC hereby requests this Court enter a judgment against Defendant Jonathan Gipperich as follows:

1. Enjoining Gipperich from using or disseminating or otherwise publishing or sharing, for any purpose, any Signode information which is in his possession, custody, or control;

2. Ordering Gipperich to immediately return any Signode information that is within his possession, custody, or control to Signode, and affording Signode or a third party vendor retained by Signode and acceptable to the Court to access and review Gipperich's personal, home, or business computers, cell phones, tablets, external data storage devises, and cloud storage accounts for the purpose of collecting and preserving Signode information illegally taken by Gipperich and ensuring that Gipperich no longer has access to such information;

3. Ordering Gipperich to identify any person (other than Signode personnel or authorized vendors) with whom he has shared Signode information both before and after the termination of his employment with Signode;

4. Entering a monetary judgment in favor of Signode and against Gipperich for damages up and until the time an injunction is issued, and for any subsequent breaches;

5. Awarding Signode exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C) and Fla. Stat. § 688.004(2); and

6. Awarding Signode any and all attorneys' fees, costs, and expenses incurred in this litigation, pursuant to Paragraph No. 10 of the Agreement, 18 U.S.C. § 1836(b)(3)(D), and Fla. Stat. § 688.005; and

7. Awarding Signode such other and further relief as the Court may consider proper.

Dated: October 20, 2025.

Respectfully Submitted,

*/s/ John J. Agliano*
John J. Agliano / FBN: 0503150
Primary: jagliano@bcalaw.com
Secondary: dcamacho@bcalaw.com
V. Stephen Cohen / FNB: 0948756
Primary: scohen@bcalaw.com
Secondary: lheckman@bcalaw.com
Jacquelyn Konakovic / FBN: 1049775
Primary: jkonakovic@bcalaw.com
**Bajo Cohen Agliano P.A.**
606 E Madison Street
Tampa, FL 33602
Phone: (813) 223-3130
Fax: (813) 490-1026
*Attorneys for Plaintiff Signode Industrial Group LLC*